GIBSON, DUNN & CRUTCHER LLP
DEBORAH L. STEIN, SBN 224570
  DStein@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  BHamburger@gibsondunn.com
TIMOTHY D. BICHE, SBN 293363
  TBiche@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

LARRY M. GOLUB, SBN 110545
  lgolub@sacrowalker.com
SACRO & WALKER LLP
700 North Brand Boulevard, Suite 610
Glendale, California 91203
Telephone: 818.721.9597
Facsimile: 818.721.9670

Attorneys for Defendant JOHN HANCOCK
LIFE INSURANCE COMPANY (U.S.A.)

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA LINHART, on behalf of herself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.) and DOES 1 to 50, inclusive,<br><br>Defendants. | CASE NO. 2:20-cv-02117-TJH-RAOx<br><br>**DEFENDANT JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.)'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE THE AMENDED EXPERT REPORT AND TESTIMONY OF KENT E. BARRETT**<br><br>Date: October 23, 2023<br>Time: UNDER SUBMISSION<br>Location: First Street Courthouse<br>　　　　350 W. 1st Street<br>　　　　Courtroom #9C, 9th Floor<br>　　　　Los Angeles, CA 90012<br>Judge: Honorable Terry J. Hatter, Jr.<br>　　　　Senior U.S. District Judge |

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ............................................................................................ 1

II. BACKGROUND ............................................................................................ 4

    A.    Plaintiff's Theory of Liability ............................................................ 4

    B.    Barrett's Damages Model .................................................................. 5

III. LEGAL STANDARD .................................................................................. 7

IV. ARGUMENT ............................................................................................... 8

    A.    Barrett's Model Is Not Relevant or Reliable Because It Does Not Actually Calculate Death Benefits, Let Alone Measure Economic Harm .................................................................................................. 8

    B.    Barrett Admits His Model Is Founded on Unreasonable Assumptions ...................................................................................... 12

    C.    Barrett's Approach Lacks Any Objective Indicia of Reliability ............. 18

V. CONCLUSION ............................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Abarca v. Franklin Cnty. Water Dist.*,
  813 F. Supp. 2d 1199 (E.D. Cal. 2011) ................................................................. 18

*Baker v. Firstcom Music*,
  2018 WL 2676636 (C.D. Cal. May 8, 2018) ........................................................ 15

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care, Corp.*,
  582 F.3d 1227 (11th Cir. 2009) ..................................................................... 8, 10

*Cano v. Cont'l Airlines Inc.*,
  193 Fed. App'x. 664 (9th Cir. 2006) ..................................................................... 20

*Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*,
  55 F. Supp. 2d 1024 (N.D. Cal. 1999) ................................................................. 18

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ...................................................................... 2, 7, 8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .................................................................................. 1, 7, 8

*Davis v. McKesson Corp.*,
  2019 WL 3532179 (D. Ariz. Aug. 29, 2019) ........................................................ 20

*Domingo ex rel. Domingo T.K.*,
  289 F.3d 600 (9th Cir. 2002) .............................................................................. 20

*DSU Med. Corp. v. JMS Co.*,
  296 F. Supp. 2d 1140 (N.D. Cal. 2003) ............................................................... 17

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................................... 7

*Fail-Safe LLC v. A.O. Smith Corp.*,
  744 F. Supp. 2d 870 (E.D. Wis. 2010) ................................................................. 18

*Gen. Elec. v. Joiner*,
  522 U.S. 136 (1997) ......................................................................... 2, 18, 19, 20

*Grodzitsky v. Am. Honda Motor Co.*,
  957 F.3d 979 (9th Cir. 2020) ............................................................................... 7

*Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*,
  344 F.3d 753 (8th Cir. 2003) .............................................................................. 10

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
  524 F. Supp. 3d 1007 (S.D. Cal. 2021) ................................................................ 18

*Jones v. United States*,
  933 F. Supp. 894 (N.D. Cal. 1996) ....................................................................... 8

*JRL Enterprises, Inc. v. Procorp Associates, Inc.*,
   2003 WL 21284020 (E.D. La. June 23, 2003) .................................................. 15

*Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*,
   428 F.3d 706 (7th Cir. 2005) ............................................................................. 10

*Kumho Tire Co., v. Carmichael*,
   526 U.S. 137 (1999) ...................................................................................... 7, 20

*In re Lithium Ion Batteries Antitrust Litigation*,
   2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) ................................................... 12

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices Prods. Liab.
   Litig. (No. II) MDL 2502*, 892 F.3d 624 (4th Cir. 2018) ................................. 18

*Lust By & Through Lust v. Merrell Dow Pharms.*,
   89 F.3d 594 (9th Cir. 1996) ............................................................................... 19

*In re Novatel Wireless Sec. Litig.*,
   2011 WL 5527198 (S.D. Cal. Nov. 17, 2011) ................................................... 19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ............................................................................... 7

*Otis v. Doctor's Assocs., Inc.*,
   1998 WL 673595 (N.D. Ill. Sept. 15, 1998) ..................................................... 17

*Owens v. Auxilium Pharms., Inc.*,
   895 F.3d 971 (7th Cir. 2018) ............................................................................. 10

*Robertson Transformer Co. v. General Electric Co.*,
   2016 WL 4417019 (N.D. Ill. Aug. 19, 2016) ................................................... 14

*Sidibe v. Sutter Health*,
   333 F.R.D. 463 (N.D. Cal. 2019) ...................................................................... 12

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) ............................................................... 18

*Sky Harbor Air Serv., Inc. v. Reams*,
   2009 WL 10688419 (D. Wyo. Oct. 28, 2009) ................................................... 15

*United States v. Amaral*,
   488 F.2d 1148 (9th Cir. 1973) ............................................................................. 4

*United States v. Prime*,
   431 F.3d 1147 (9th Cir. 2005) ........................................................................ 8, 19

*United States v. Valencia-Lopez*,
   971 F.3d 891 (9th Cir. 2020) ................................................................ 1, 3, 8, 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

1

2

**Statutes**

3

California Insurance Code § 10113.72(b) ......................................................................4

4

**Rules**

5

Fed. R. Evid. 702 ............................................................................................................7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# I.  INTRODUCTION

Plaintiff's proposed damages expert, Kent Barrett, purports to have created a classwide damages "model"—something he has done only once before.  To be relevant and reliable under the Federal Rules of Evidence, any damages model must measure the economic harm allegedly attributable to the defendant.  Barrett admits his model does *not* measure the economic harm that the putative class members allegedly suffered.  Dkt. 164-1 (Barrett Tr.) 240:2–241:5 (admitting he awards damages to individuals who were not harmed "from an economic standpoint").  Rather, his simplistic approach was to perform certain interest calculations on life insurance policy "face amounts" that were fed into the "model"—a mere equation of face amount times interest rate.  That is hardly the stuff of expert testimony.

Worse still, Barrett took a shortcut that renders his model's calculations meaningless: he relied on face amounts of the policies as a proxy for death benefits owed, even though he admitted those are often not the same thing.  Barrett Tr. 210:3-4.  For example, death benefits under variable life insurance policies require calculation of investment returns, something that Barrett did not even attempt to calculate.  Dkt. 162-1 (Merrill Report) 16-17.  Death benefits under other policies would require complex analyses of account values and policy loans.  *Id*.  And for the majority of policies in his model Barrett performed no verification whatsoever that the face amounts he used reflected the true face amounts.  That is a critical failure, as Barrett himself admitted that a damages model is only as good as its inputs—"garbage in, garbage out," as he put it at his deposition.  Barrett Tr. 37:5.  Because Barrett's model did not calculate death benefits but just reported the largely unverified face amount times interest, it is neither relevant nor reliable.

Before admitting expert testimony, the district court must perform a "gatekeeping role" to ensure that the testimony is both relevant and reliable.  *United States v. Valencia-Lopez*, 971 F.3d 891, 897-98 (9th Cir. 2020) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  Testimony is not relevant unless the court is

"convinced" that it directly "fits" the case and will not mislead the jury which might have "difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert II*"). Testimony is not reliable if it's based on unreasonable factual assumptions or where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). The gap between face amounts and death benefits is exactly what renders Barrett's testimony unreliable.

Barrett's model is also unreliable because it is built on unreasonable assumptions that Barrett himself testified are contrary to his experience in the life insurance industry. Barrett testified that his assignment was to calculate what would be owed for polices (1) had they not lapsed for nonpayment of premium and (2) were kept in force by the policyowners through the date the insureds died—which was often many years after the lapse. Barrett Tr. 227:16-22. But Barrett admitted that it would be unreasonable to assume that, even if the life insurance policies had not lapsed when they did, all policyowners would have kept the policies in force in the coming years.

As one example, Barrett assumed that a policy that lapsed in 2013 would have remained in force until the insured's death more than eight years later, even though for the three years prior to the insured's death, the premiums would have been more than $200,000 *a year*—more than ten times the premium during the level term. Dkt. 163-3 at 3. Barrett made that assumption, even though he conceded that policyowners generally do not keep term life insurance policies after they reach the end of the term (as it becomes exorbitantly expensive to do so). Barrett Tr. 182:9-22 (the "most common" thing for policyowners to do when a term policy reaches the end of the level term period "is to allow the policy to lapse"). In fact, of the term policies in the policy list, 95% lapsed within one year of the end of the level term. Merrill Report 37.

Barrett also admitted that "keyman" policies, in which companies take out insurance policies for certain employees, typically terminate when the employee leaves the company. Barrett Tr. 221:14-222:11. Yet Barrett's model awards millions in

Gibson, Dunn &
Crutcher LLP

2

damages to a major media corporation that took out a keyman policy on a prominent radio host.  The documents in the policy show that the purpose of the policy was to insure their investment in the host during a finite period, Dkt. 163-2, and the policy lapsed after that period ended.  Merrill Report, App'x A at 2.  Yet despite Barrett's expertise in the insurance industry, he failed to incorporate that knowledge as an expert into his analysis, and instead simply assigned damages amounts to the beneficiaries of such policies because that is what counsel asked him to do.  Barrett Tr. 236:19-237:22 ("What I was asked to do is … to develop a methodology to quantify the impact of these policies not having had their death benefits paid out … I didn't speculate about what might or would or could have happed.  I simply said this is a quantification of what would have happened had the policies stayed in effect.").

Barrett also repeatedly admitted that he was not measuring economic harm.  *Id.* 214:24-215:12, 217:18-218:2.  In fact, Barrett agrees that his model includes damages for putative class members who did not suffer any economic harm whatsoever.  *Id*. 240:10-241:5.  For example, Barrett identified two policies with purported face amounts of $7.5 million each and calculated $19 million in damages (face amount times interest)—four percent of the total damages Barrett calculates.  Merrill 30-31.  But the policy documents—which were available to Barrett—show that the face amounts of these policies had been reduced to $0 at the time of lapse.  Dkt. 163-1 at 4.  When shown these documents Barrett maintained that they were entitled to nearly $20 million in damages even though they were not economically harmed.  Barrett Tr. 233:17-235:3.

It is the burden of the party offering the opinion "'to establish the reliability of the principles and methods employed.'"  *Valencia-Lopez*, 971 F.3d at 900.  But Barrett admitted that his methodology was created for litigation and that his opinion was not subject to routine testing, error rate, or peer review-type analysis.  Because Barrett is offering "experience-based" expert testimony, ensuring his methodology is reliable is "more, not less, important" than when the opinion is "science-based."  *Id*. at 898.  Plaintiff has offered nothing more than Barrett's say-so that his methodology is reliable,

Gibson, Dunn & Crutcher LLP

and courts require more than such *ipse dixit* when exercising their gatekeeping role.  The gatekeeping role of the court is crucial because expert testimony poses significant danger "of undue prejudice or of confusing the issues" because of "its aura of special reliability and trustworthiness."  *See United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973)

Given these significant, fundamental flaws, Barrett's report and testimony should be excluded.

## II.  BACKGROUND

### A.    Plaintiff's Theory of Liability

This is a breach of contract case.  Plaintiff's husband (James Linhart) owned a John Hancock life insurance policy for which Plaintiff was the named beneficiary.  As explained more fully in John Hancock's Motion for Summary Judgment, Dkt. 139-1 (MSJ), several months before his unexpected death, Mr. Linhart called John Hancock, told a company representative he wanted to cancel the policy, and instructed the representative to stop his automatic bank payments in order to effectuate the termination.  Dkt. 139-3.  The policy "lapsed" as a result, and Mr. Linhart received and filed away the lapse notices sent to him by John Hancock.  Dkts. 139-5, 139-6, 139-7, 139-18 at 50-51.  Nonetheless, Plaintiff seeks payment of the policy's death benefit, claiming that John Hancock breached the policy because John Hancock had not sent Mr. Linhart a notice explaining that he had the right to designate someone else to receive lapse-related communications—and thus Plaintiff claims John Hancock "improperly terminated" the policy and should have paid out the death benefit.  Dkt. 118 (FAC) ¶ 42.

Plaintiff brings this action on behalf of a putative class of beneficiaries for which the policyowners were not provided notice of their right to designate another individual to receive lapse notices pursuant to California Insurance Code Section 10113.72(b), and for which policies the insured subsequently passed away.  FAC ¶ 48.  The putative class includes beneficiaries for all types of life insurance policies, including level term life insurance, whole life insurance, and universal life and variable universal life insurance.  Merrill Report 18.  Some of the policies were owned by individuals, some by business

entities, and some by trusts.  Barrett Tr. 221:22-222:2, 224:17-225:4.

## B.   Barrett's Damages Model

In support of her motion for class certification, Plaintiff has submitted the report of Kent Barrett, a certified CPA and forensic accountant who has worked the majority of his career in the life insurance industry, including as Chief Financial Officer of American General Life Insurance Company.  Dkt. 145-1 (Barrett Report).  Barrett's damages model purports to calculate "the death benefits that would have been received had the policy not been lapsed or terminated by John Hancock," plus "interest ... from the date of death to the judgment payment date."  *Id.* 22.

Barrett was instructed by counsel to make two assumptions when calculating alleged damages: (1) policies for which notices were not sent could not have lapsed for nonpayment of premiums, and (2) the policies would have still been in force at the time of the insured's death.  Barrett Tr. 29:13-30:7 ("the damages that [he was] calculating are the amounts that would have been due had these policies not been lapsed"), 31:12-19, 32:7-11 (agreeing that his role was to calculate what "the damages would have been if the life insurance policies remained in effect until the date of death"), 72:14-20.

Based on these assumptions, Barrett endeavored to calculate damages in two steps.  First, Barrett had to input into his model dollar values that reflected the death benefit that would be owed to each beneficiary.  Barrett Report 22.  But instead of determining what death benefits would have been owed, Barrett decided to instead use policy "face amounts" as "representing the death benefits." *Id.*  To identify these face amounts, Barrett primarily relied on a "policy list" generated by John Hancock for purposes of discovery in this litigation.  *Id.* 12-16.  The policy list identified certain information regarding policies issued in the state of California before January 1, 2013 that became inactive on January 1, 2013 or later, that were coded as lapsed in John Hancock's administrative system, and that matched information available to a third party vendor suggesting the insured potentially passed away after the policy lapsed.  Dkt. 163 (Stewart Decl.) ¶¶ 5-11.  The Policy List lacks much of the information needed to

"properly administer[]" claims. *Id.* ¶ 12. As one example, the list codes policies as "lapsed" but doesn't disaggregate those that didn't lapse for nonpayment of premiums (e.g., where a policyowner elected not to renew). *Id.* ¶¶ 14-17. The list also identifies policy "face amounts" at the time of lapse but crucially it does not identify "death benefits," which often differ. *Id.* ¶¶ 20-21. Approximately 39% of the policies on the list had a face amount of "NULL" or "0." Barrett Report 14. For those policies, Barrett relied on an excel file in which Plaintiff's counsel had changed 84% of the "NULL" or "0" face amounts to specific dollar values based on select documents that John Hancock had produced in discovery. *Id.* 15. Barrett and his staff reviewed the documents identified by counsel to "confirm or correct the face value amounts filled in by counsel." *Id.* 16. While Barrett speculated that the face value of the policies "[i]n most instances" "will equal" the death benefit, he admitted that "there could be policies that provide for increasing or decreasing death benefits over time," that policies may have additional "benefit riders" that may impact the amount of death benefits in specific circumstances, and that "universal life, variable life and variable universal life policies typically have options that could cause the death benefit to be different than the face amount." *Id.* Barrett did not review any policy files in full to determine what the correct death benefit was, even though he admitted that he was aware that insurance companies typically determine a death benefit "[b]ased on a review of the documentation in the file with respect to the death of the insured and provisions in the policy." Barrett Tr. 46:12-20.

Second, Barrett applied interest rates ranging from 3.5% to 10% to the face amount of each policy and compounded that interest rate annually, starting at the time of the insured's death. Barrett Report 23-24. Each rate is applied uniformly to the face value of all policies. *Id.* While Barrett admitted that individual policies might provide for a specific interest rate, his model does not account for variations in rate between policies and he did not look at the policy files to determine what the rate would be for any given policy. Barrett Tr. 168:4-169:13. Barrett was simply instructed to apply the various rates by counsel, and does not offer an opinion on the correct interest rate.

Barrett Report 23-24.

Barrett acknowledges additional factors would affect the measure of harm to each class member, including:  (1) loans taken out by the policyowner against the policy, Barrett Tr. 98:11-25, (2) unpaid premiums that would be owed on the policy had it stayed in effect past the date it lapsed, Barrett Report 25, and (3) investment income or cash value for certain policies, Barrett Tr. 51:4-51:12.  Barrett admits these factors should be "consider[ed]" in calculating damages, Barrett Report 10, 25, but he did not account for these factors in his model.  Barrett Tr. 98:11-100:5, 212:9-213:5, 214:9-23.

### III.  LEGAL STANDARD

John Hancock seeks to exclude Barrett's report and testimony for all purposes in this action, including Plaintiff's Motion for Class Certification and John Hancock's Motion for Summary Judgment.  This Court's "gatekeeper" function requires it to assess an expert's methodology and exclude testimony that does not comply with Rule 702 and *Daubert*, 509 U.S. 579.  *See Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999); *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 n.7 (9th Cir. 2022) (en banc) ("In a class proceeding, defendants may challenge the reliability of an expert's evidence under" *Daubert* and Rule 702.).  An expert may provide opinion testimony only if:  (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (2) the testimony is based upon sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the actual facts.  Fed. R. Evid. 702.  Expert testimony is admissible only if it is *both* relevant and reliable.  *Daubert*, 509 U.S. at 590-91.

To be "relevant," the expert testimony must "fit" the facts of the case and must "logically advance[] a material aspect of the proposing party's case."  *Daubert II*, 43 F.3d at 1315.  This rule is stricter than Rule 402's relevancy standard, "recogniz[ing] the

special dangers inherent in scientific expert testimony." *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996).  Where a damages expert's testimony does not "fit" a party's liability theory, the testimony must be excluded.  *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care, Corp.*, 582 F.3d 1227, 1231-32 (11th Cir. 2009).

In assessing reliability, courts must consider (1) whether a theory or technique "can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error" and whether there are controlling standards; and (4) whether there is "general acceptance" of the methodology in the "relevant scientific community." *Daubert*, 509 U.S. at 590, 593-94.  This "'basic gatekeeping obligation' applies with equal force" to "non-scientific experts." *United States v. Prime*, 431 F.3d 1147, 1151-52 (9th Cir. 2005).  "[R]eliability is the lynchpin," and it becomes "more, not less, important" when an expert is offering non-scientific testimony.  *Valencia-Lopez*, 971 F.3d at 898.  The court's gatekeeping role requires the court to ensure that "an expert's methods are reliable" and are "adequately explained," a burden that falls on the party offering the expert opinion.  *Id*. at 900.

## IV.  ARGUMENT

### A.  Barrett's Model Is Not Relevant or Reliable Because It Does Not Actually Calculate Death Benefits, Let Alone Measure Economic Harm

Barrett's model does not do what Barrett says it's supposed to do:  it does not yield the death benefit plus interest for each of the putative class members.  Expert testimony is only "relevant" if it "fits" the facts of the case and "logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315.  Where, as here, a damages expert's testimony does not "fit" a party's liability theory—that is, the expert's testimony does not quantify the "economic impact" of the harmful event the plaintiff seeks to recover for—the testimony must be excluded.  *Boca Raton*, 582 F.3d at 1231-32 (excluding expert testimony for lack of "fit" because it did not isolate damages attributable to unlawful conduct).

Barrett suggests he created a model that tells the Court what death benefits would be owed under each of the policies if they had remained in force through the insured's death. His "model," which is essentially an interest calculator, is fundamentally flawed because it is running the interest calculations on what are in many cases the wrong numbers. That's because Barrett didn't "input" the death benefits for all of the policies. Instead, he used the policy face amounts. That might be the right input for term policies (had Barrett reliably validated those face amounts), but only about half of the policies at issue are term policies. Merrill Report 18. For non-term policies, face amount is not the same thing as the death benefit. Dkt. 161-1 (Reynolds Report) 5, 25-26.

Barrett knows this. One of his favorite phrases is "garbage in, garbage out." Barrett Tr. 37:1-5. Because Barrett's inputs into his interest-calculator model are "garbage," the outputs are as well.

As explained above, Barrett's model uses as its foundation the "face amounts" from the policy list generated by John Hancock for the purpose of answering a specific interrogatory. Stewart Decl. ¶ 11. Other than adding face amounts identified by Plaintiff's counsel for policies where the face amount was listed as "NULL" or "0" in the policy list, those are the inputs for Barrett's model—Barrett made no further modifications to the face amounts that he fed into his model. Barrett then simply totaled the face amounts and multiplied them by various interest rates. Barrett Tr. 94:12-95:5. Barrett did this even though he admits that the face amount is not the same thing as death benefit. *Id*. 95:6-21, 210:2-5 (there are instances where the face amount "is not reflective of the net death benefit"). Thus, Barrett calculated something entirely disconnected from Plaintiff's theory of liability. **Rather than calculate the total *death benefits* under the subject policies with interest, Barrett calculated the total *face amounts* of those policies with interest.**

Barrett admitted in his deposition that his failure to follow the proper procedure for calculating death benefits owed under insurance policies produced dramatically different results than if he had truly attempted to quantify the harm associated with

Plaintiff's theory of liability.  As just one example, Barrett determined that two of the relevant policies had face amounts of $7.5 million each (the Policy List said "NULL" for both), and therefore assumed that the total death benefits owed under those two policies was $15 million.  Barrett Tr. 229:6-230:10 (agreeing that he attributed $15 million before interest for two policies with face value of $7.5 million each).  But documents associated with those policies—which were available to Barrett when he performed his analysis—showed that the owners of those two policies reduced the face amount of the policies to $0 shortly before the policies lapsed.  Dkt. 163-1 at 4.  When confronted with these documents, Barrett conceded that the owners of these policies *were not harmed*, but he would nonetheless include them in his "damages" calculation. Barrett Tr. 233:17-234:20; Merrill Report 30-31.

As the Eleventh Circuit noted in excluding a similarly ill-fitting expert damages report, "[h]aving tailored a trim-fitting liability theory for the body of its case," Plaintiff "cannot hang a baggy injury and damages theory on it." *Boca Raton*, 582 F.3d at 1233. Nor does it suffice to say that these issues can be worked out by the jury.  Rather, "whether an expert's approach lines up with the basic facts of the case goes to relevance and admissibility of the testimony itself."  *Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018); *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 712 (7th Cir. 2005) (expert testimony properly excluded where "evidence of damages failed to match the theory of fraud upon which [plaintiff] had prevailed at trial").  Where the expert's assumptions are "directly contrary" to the plaintiff's case theory, exclusion is appropriate.  *Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 (8th Cir. 2003).  Because Barrett readily concedes that his damages model does not to align with Plaintiff's theory of liability, his model should be rejected.  *See* Merrill Report 28-29 (explaining why Barrett's calculations are not "equivalent to damages").

Barrett's model also does not account for modifications he admits are necessary to accurately measure death benefits.  Barrett acknowledges his damages model may

need to, but currently does not, incorporate each of the following variations among the putative class:

- **Variations between the face value and the death benefit.**  Barrett admits that, for a meaningful number of policies, "there might be a difference between the face value and the death benefit."  Barrett Tr. 94:12-20, 153:14-154:18, 155:2-12, 157:15-18.  For example, for some types of policies, the death benefit will be "the face value *plus* the account value." *Id.* 193:20-194:3, 210:18-211:7 (emphasis added).  And for certain types of policies—where the death benefit is linked to the performance of investments—the calculation of the benefit depends on the specific factors such as when a policy premium was paid, and how the market was performing.  Merrill Report 17 (describing how variable universal life policyholders face risk due to exposure to market conditions); Reynolds Report 5-6 (explaining why face amount at the time of lapse is not a proxy for death benefit).

- **Variations in the existence and amount of policy loans.**  Barrett admits some policies had "outstanding policy loans at the time that they were lapsed." Barrett Tr. 94:21–25. He also agreed that "an adjustment … needs to be made against the cash value [of a policy] to get the net death benefits" when there was a "policy loan," but he conceded that he "did not attempt to do a comprehensive review of the data . . . to determine where" that was necessary. *Id.* 99:9-100:17.

- **Variations in interest rate.**  Barrett recognizes that individual policies might specify the individual interest rate "that would apply to death benefits … between the period of date of death and date of payment." *Id.* 168:4-12. But, because he "d[idn't] know what the right answer is" as to interest rate, *id.* 169:8-13, Barrett's methodology does not account for variations in interest rate among policies.

Barrett provides no formula or methodology for determining the existence or amount of any of the modifications, even though he admitted that *between 10 and 25 percent* of certain policy types could have had death benefits that were materially different than the initial face amount he used in his calculation. Barrett Tr. 153:16-154:18 ("it could be 25 percent" of traditional whole life policies "that had a policy loan outstanding"), 155:2-12 (estimating that 10 percent of policies would need adjustments, but acknowledging it's a "wild card"), 157:15-18 (could be as many as 25 percent of universal life policies had policy loans). Barrett's justification for not including this information is to speculate that at some future date he will have data readily available, which will be factored in. *Id*. 210:12-17.

Courts routinely hold that classwide damages models are unreliable when they fail to account for certain factors. For example, in *Sidibe v. Sutter Health*, 333 F.R.D. 463, 497 (N.D. Cal. 2019), the court held that an expert's damages model was unreliable where the expert acknowledged competition from rival health plans would affect whether the defendant passed along 100 percent of its costs to consumers, but offered no methodology for taking this factor into account. Similarly, in *In re Lithium Ion Batteries Antitrust Litigation*, 2017 WL 1391491, at *12 (N.D. Cal. Apr. 12, 2017), the putative class's expert "acknowledged that bundling, rebates, and discounts would affect the accuracy of cost data, but ... offered no methodology to account for it in his analysis." Here, Barrett does exactly the same as the experts in *Sidibe* and *Lithium Ion Batteries*: he recognizes a number of factors that will necessarily alter his damages calculations, but makes no effort to incorporate these factors into his methodology. This is impermissible under *Daubert*.

**B.    Barrett Admits His Model Is Founded on Unreasonable Assumptions**

Barrett's model should further be excluded because, at every turn, Barrett failed to apply his expertise to the facts of this case. Barrett is a forensic accountant, Barrett Tr. 22:2-5, 22:12-14 ("a forensic accountant would be involved in reviewing and analyzing documentation and other evidence"), 23:6-7 ("[f]orensic accountants go

behind a spreadsheet") and an expert in life insurance, *id*. 43:15-44:25, 86:5-9.   Yet Barrett ignored this expertise when he (1) assumed that all policies would still be in effect at the time of the insured's death when his experience in the life insurance industry provided significant evidence certain policies would not be, (2) improperly delegated to plaintiff's counsel the task of identifying the face amount for certain policies, and (3) failed to use his expertise in forensic accounting to determine the proper amount of damages that would be awarded to class members.

   ***Assuming Policies Would Still Be in Effect at Time of Death.***   Barrett testified that he assumed that all the policies that lapsed would still be in effect at the time of the insured's death.   Barrett Tr. 31:4-19, 32:7-15, 237:15-22.   But Barrett admitted that this assumption was contradictory to his experience in the life insurance industry for certain types of policies.

- **Term Policies**.   Term policies have a level premium for a set amount of time, after which "the premium goes up significantly."   *Id.* 63:18-20. Barrett testified that due to this increase in the premium amount, a "large number" of term policy insureds would have allowed their term policies to "lapse" at the conclusion of their level term period.   *Id.*; Merrill Report 37 (chart showing that 95-98% of term policies in policy list terminated within one year of the end of the level term).   Even though Barrett admitted "many" insureds whose level terms have ended forgo life insurance if they are retired and no longer need it, or "mov[e] to another policy," Barrett Tr. 63:21-64:2, Barrett nonetheless assumed that class members would have kept their term policy in force after the end of the term policy—in some cases paying hundreds of thousands of dollars a year for insurance over many years (even where doing so would be irrational because premiums would exceed the death benefit).   *Id.* 217:10-218:2 (when amount policyowner owed in premium exceeds death benefit Barrett "d[id] not see an economic detriment").

- **"Keyman Policies"**  Similarly, Barrett ignored his expertise related to "keyman life insurance," where companies purchase life insurance to insure against the loss of a key employee.  Barrett testified that such policies are "not uncommon," *id.* 180:15-18, and that it *was* "common" for a company to lapse a keyman policy shortly after the insured individual leaves the policyowner's employment because an employer has no reason to continue to pay to insure individuals no longer in their employ, *id*. 222:8-11.  Yet Barrett did not review the policy records to determine which of the policies were keyman policies, and therefore necessarily assumes that every keyman policy would remain in force (even where the insured individual was no longer with the company).  *Id*. 222:12-17.  This is not a trivial error.  For example, for one keyman policy, Barrett's model awards millions in damages to a major media corporation that took out a keyman policy on a prominent radio host, despite the fact that the policy lapsed shortly after the 10-year level-term ended and nearly 3 years before insured individual died.  Merrill Report, App'x A at 2.

Barrett's failure to employ his expertise renders his opinions unreliable.   In *Robertson Transformer Co. v. General Electric Co.*, 2016 WL 4417019, at \*4 (N.D. Ill. Aug. 19, 2016), the district court excluded a party's expert in economic analysis where, "nothing in [the expert's] report suggest[ed] that he performed any economic modeling."  And in *JRL Enterprises, Inc. v. Procorp Associates, Inc.*, 2003 WL 21284020, at \*8 (E.D. La. June 23, 2003), the court excluded an expert's damages opinion that purported to calculate lost profits "but for" an alleged breach after finding that the expert conducted no independent investigation of the data and representations provided to him, and "failed to show that reasonable accountants would simply and blindly accept such numbers in formulating opinions."  The court explained that the expert's failure to exercise his expertise meant that plaintiff was merely "presenting its own estimation of damages in the guise of expert opinion." *Id.*

The same problem exists here.  Plaintiff cannot present a damages expert with accounting and life insurance expertise, have that expert develop a model that depends on analysis within that area of expertise—here, a computation of death benefits that would be awarded to beneficiaries—and then have the expert ignore his expertise bearing on the validity of the rates and blindly follow directions of counsel.  Otherwise counsel can present a self-serving damages model under the guise of actuarial or scientific legitimacy when, in fact, it fails the tests for legitimacy used in that discipline.

**_Relying on Plaintiff's Counsel to Determine Death Benefits._**  Where the policy list had "NULL" or "0" listed for the face amount, *Plaintiff's counsel* filled in the face amount and indicated where in the record the face amount they added could supposedly be found.  Barrett Report 15-16.  Barrett says he and his staff "verified" those amounts by looking at the specific documents counsel pointed to.  But Plaintiff's counsel are not experts in life insurance or forensic accounting.  Nor is it clear whether counsel reviewed entire policy files to determine whether the face amount equaled the death benefit that would have been owed at the time of the insured's death.  *Id.* 16.  It *is* clear, however, that neither Barrett nor his staff took any steps to determine whether the face amount identified by counsel is the same as the death benefits to which a beneficiary would be entitled.

Courts consistently use their gatekeeping function to exclude expert testimony where the expert blindly accepts assumptions and data provided by counsel without investigating their reliability.  *Baker v. Firstcom Music*, 2018 WL 2676636, at *2 (C.D. Cal. May 8, 2018) (excluding testimony where expert "failed to verify the underlying data at the core of her expert opinion independently, and instead simply adopted the position of an interested party"); *Sky Harbor Air Serv., Inc. v. Reams*, 2009 WL 10688419, at *2-3 (D. Wyo. Oct. 28, 2009) (rejecting as unreliable expert's opinion that was "almost completely based on what plaintiffs told him to put into his report").  Simply reviewing the documents provided by counsel—potentially a single cherry-picked document from a large policy file—rather than the full policy file to identify the death

benefit is the exact kind of acceptance without investigation that courts are required to guard against.

***Failure to Apply Forensic Life Insurance and Accounting Expertise***.   As explained above, Barrett did not review policy documents even though his experience in the life insurance industry and as a forensic accountant should have indicated to him that a deeper look at the policy file was needed.  In a prior role "auditing life insurance companies," Barrett was responsible for making "sure the right death benefit was paid," and did so "[b]ased on a review of the documentation in the file with respect to the death of the insured and the provisions of the policy."  Barrett Tr. 45:7-9, 46:12-20.  In other words, when his client was paying death benefits, Barrett looked at the policy records, including the insurance policy itself, to determine the death benefit to which the beneficiary was entitled.  Although John Hancock has produced over 30,000 documents relating to policies on the policy list, totaling nearly 130,000 pages of documents, Barrett relied on "a few Excel files" and "[f]or the most part," he did not review the actual life insurance policies of the putative class members.  *Id*. 19:9-13, 90:19-21.

The effect of unpaid premiums is one example of Barrett's failure to employ his expertise.  When the policyowner is also the beneficiary, the person who was responsible for paying the premium is the same person who would be theoretically entitled to damages in this case.  Barrett admitted that such a policyowner would owe premiums from between the date of lapse and the insured's death.  Barrett Report 23.  For some, the unpaid premiums could exceed the death benefit on some policies.  Barrett Tr. 218:21-25.  For those beneficiaries who were also policyowners, they would have experienced no "economic detriment" at all.  *Id*. 217:10-22.  Given the potential significance of this information, one would expect Barrett to review the policy files to identify when this occurred.  But Barrett did not even look for this information in the files to which he was provided access.

***Assuming That Policies Would Have Continued But For a Lapse.***   Barrett assumes that after the policies lapsed, they would have remained in force until the time

Gibson, Dunn & Crutcher LLP

of the insured's death.  But this wholly speculative assumption ignores reality, as Barrett himself admitted.  Barrett Tr. 63:3-64:2 ("a large number lapse if the premium goes up significantly at the end of the level term period," "many … may lapse because they are, you know, effectively moving to another policy," "[o]r maybe they've reached the end of the time period … and don't need as much life insurance, and so they just let it lapse"). Barrett also acknowledged that keyman policies do not remain in force after the insured employee leaves the company.  *Id*. 222:3-11.

Yet Barrett did not endeavor to do any calculations to determine whether beneficiaries were actually harmed by the policies lapsing for nonpayment when they did.  *Id.* 237:15-241:5.  As noted above, when confronted with evidence that two policyholders would have canceled their policies following a lapse, rather than incorporate this evidence of the "but for" world into his damages methodology, Barrett stated "I didn't speculate about what might or would or could have happened."  *Id*. 237:19-22.

Ignoring economic realities is the hallmark of flawed expert testimony, and that is exactly what Barrett did here.  *See, e.g.*, *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1157-59 (N.D. Cal. 2003) (excluding as "speculation" damages opinion that did not account for relevant "market circumstances" and "economic reality"); *Otis v. Doctor's Assocs., Inc.*, 1998 WL 673595, at *4 (N.D. Ill. Sept. 14, 1998) (excluding damages expert who "failed to establish that [his estimates] have any basis in fact or … market reality").

\*     \*     \*

Barrett "performed an arithmetic exercise without consideration of the policy records that John Hancock produced that would have allowed for some semblance of an informed perspective."  Merrill 31.  At every turn, Barrett ignored his expertise and instead opted to inflate the amount of damages being sought here.  This is not permitted.

An expert cannot ignore data in developing his expert opinion, and certainly cannot do so without explaining what steps he took to validate the assumption that it was

permissible to ignore this data.  *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 898-99 (C.D. Cal. 2004) (excluding testimony where expert ignored facts and data that should have influenced his opinion); *Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1040 (N.D. Cal. 1999) (striking expert report that ignored data and failed to demonstrate that report constituted valid scientific practice).  Likewise "[c]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data." *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1038 (S.D. Cal. 2021) (citing *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices Prods. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018)); *Fail-Safe LLC v. A.O. Smith, Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) (where expert "all but 'cherry pick[s]'" his data and treats contrary evidence with "unwarranted dismissal" or "outright blindness," expert report is unreliable and should be excluded).

## C.    Barrett's Approach Lacks Any Objective Indicia of Reliability

Expert testimony is not presumptively admissible just because it was prepared by an expert.  "An expert's opinion need not be accepted uncritically simply because his credentials render him qualified to testify." *Abarca v. Franklin Cnty. Water Dist.*, 813 F. Supp. 2d 1199, 1204 (E.D. Cal. 2011).  Rather, the party offering the opinion bears the burden to show that the conclusion is based on reliable principles and methods. *Valencia-Lopez*, 971 F.3d at 900.  When an expert's testimony is "experience-based" rather than "science-based," like Barrett's, "reliability becomes more, not less important." *Valencia-Lopez*, 971 F.3d at 898.  Some indicia of reliability include whether a methodology "can or has been tested;" has been subject to peer review; has a "known or potential rate of error;" has "standards controlling [its] operation;" and has "general acceptance" in the "relevant community." *Prime*, 431 F.3d at 1151-52. Because Barrett created his methodology for litigation—and it meets none of these objective factors—the Court is left with nothing more than Barrett's assurances that his methodology is reliable.  That is not sufficient to satisfy the gatekeeping requirement. *Joiner*, 522 U.S. at 146.

Barrett's methodology does not meet any of the objective criteria for reliability. Barrett's report was "reviewed" by someone on his team who assisted him in "finalizing the report." Barrett Tr. 85:4-9, 109:25-110:5. The methodology has not been tested (nor could it be) and Barrett admits it has no known error rate. *Id.* 110:6-20. Barrett did not run any tests or otherwise validate whether the face amount equaled the death benefit for any policy. And, there is no "general acceptance" in the "relevant community"—Barrett testified that he did not rely on any books or publications to inform his methodology, *id.* 111:3-6; has not written any publications or given any professional talks on the methodology, *id.* 111:7-10; Barrett Report A-1-A-2; and is not aware of any other experts who have used his methodology, Barrett Tr. 111:11-16. That Barrett's model fails the Ninth Circuit's objective reliability criteria confirms that it lacks support from any independent or objective source.

That Barrett's methodology was created for litigation is a "very significant fact." *Lust By & Through Lust v. Merrell Dow Pharmaceutical*, 89 F.3d 594, 597 (9th Cir. 1996). In such circumstances, "the expert 'must explain precisely how [he] went about reaching [his] conclusions and point to some objective source" to show that he has followed principles relevant to the subject of the testimony. *Id.* Barrett's litigation-only model should be excluded because he could identify no accounting principles that apply to his methodology. Barrett Tr. 26:25-26:6. *See In re Novatel Wireless Sec. Litig.*, 2011 WL 5827198, at *5 (S.D. Cal. Nov. 17, 2011) (excluding expert report that cites "no professional standards or principles and utilizes no specialized knowledge").

Because Barrett nowhere explains why it was acceptable to use face amounts as a replacement for death benefit, why it was acceptable for him to not make any adjustments to the face amounts, or how his ultimate damages opinion will account for all the factors he recognizes need to be considered in determining death benefit, the court has nothing to assure itself that Barrett's model is reliable other than his say-so. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

expert." *Joiner*, 522 U.S. at 146. A trial court may exclude evidence when it finds "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see also Kumho Tire Co.*, 526 U.S. at 157; *Domingo ex rel. Domingo T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (affirming the exclusion of the *ipse dixit* testimony that was not based upon objective, verifiable evidence); *Cano v. Cont'l Airlines Inc.*, 193 Fed. App'x. 664, 666 (9th Cir. 2006) (affirming exclusion of plaintiff's expert testimony as little more than *ipse dixit* where plaintiff "made no real effort to show how [the expert] went about reaching his conclusions" or how the expert "applied scientific principles and methods to the facts of this case."); *Davis v. McKesson Corp.*, 2019 WL 3532179, at *25 (D. Ariz. Aug. 29, 2019) (excluding expert testimony when expert's *ipse dixit* was used to connect existing data to an unproven conclusion).

## V. CONCLUSION

The court should exclude Barrett's report and testimony offered in support of Plaintiff's Motion for Class Certification.

DATED:  September 8, 2023

GIBSON, DUNN & CRUTCHER LLP
SACRO & WALKER LLP

By: */s/ Deborah L. Stein*
Deborah L. Stein
Bradley J. Hamburger
Larry Golub

Attorneys for Defendant
JOHN HANCOCK LIFE INSURANCE
COMPANY (U.S.A.)

Gibson, Dunn &
Crutcher LLP

**LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant John Hancock Life Insurance
Company (U.S.A.), certifies that this brief contains 6,922 words, which:

_x_ complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated _____.


DATED:  September 8, 2023                    GIBSON, DUNN & CRUTCHER LLP


                                             By: _/s/ Deborah L. Stein_____
                                                  Deborah L. Stein

                                             Attorneys for Defendant
                                             JOHN HANCOCK LIFE INSURANCE
                                             COMPANY (U.S.A.)

Gibson, Dunn &
Crutcher LLP